## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 20 2020, 10:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent–Child Relationship of R.C. (Minor Child) | July 20, 2020 |
| and | Court of Appeals Case No. 20A-JT-270 |
| B.C. (Mother), *Appellant-Respondent,* | Appeal from the Marion Superior Court |
| v. | The Honorable Marilyn A. Moores, Judge The Honorable Scott B. Stowers, Magistrate |
| Indiana Department of Child Services, *Appellee-Petitioner.* | Trial Court Cause No. 49D09-1907-JT-605 |

**Bradford, Chief Judge.**

# Case Summary

[1]     B.C. ("Mother") is the biological mother of five children, including R.C. ("Child").[1] The Department of Child Services ("DCS") became involved with Mother and Child due to concerns of drug use by Mother during pregnancy. DCS filed a petition alleging that Child was a child in need of services ("CHINS") after discovering unsafe living conditions in the family's home. Child was initially left in Mother's care after he was determined to be a CHINS. However, Child was ultimately removed from Mother's care due to ongoing concerns of Mother providing an unsafe and unstable living environment. Mother was ordered to complete certain services both prior to and following Child's removal. DCS eventually petitioned to terminate Mother's parental rights to Child after Mother failed to successfully complete the ordered services. Following an evidentiary hearing, the juvenile court granted DCS's termination petition. On appeal, Mother contends that DCS failed to present sufficient evidence to support the termination of her parental rights. We affirm.

# Facts and Procedural History

---

[1] This appeal only concerns the termination of Mother's parental rights to Child as she has voluntarily relinquished her parental rights to her other four biological children. In addition, the parental rights of Child's biological father have previously been terminated and Child's biological father does not participate in this appeal.

[2]     In April of 2015, DCS Family Case Manager ("FCM") Amanda McCullough became involved with Mother while investigating a report that Mother had delivered a baby and that both Mother and the baby had tested positive for marijuana. Mother admitted to FCM McCullough that she had used marijuana while pregnant. Mother also informed FCM McCullough that she had been evicted from her apartment and did not have anywhere to live. Mother eventually secured housing by moving in with a friend.

[3]     DCS opened an informal adjustment case for the family, pursuant to which Mother was required to participate in random drug screens, participate in home-based case management, complete a substance-abuse assessment, allow an FCM into her home, and keep in contact with DCS. During the Fall of 2015, DCS received reports that the family had no electricity, Child and his siblings played by an open second-story window, the youngest sibling slept in unsafe conditions, Child and one of his siblings had missed many days of school, there was no furnace in the home, and one of Child's siblings had bedbug bites.

[4]     FCM Charla Davis started working with Mother in November of 2015. On December 4, 2015, DCS filed a petition alleging that Child was a CHINS. The same day, DCS removed Child from Mother's care. After five days, DCS returned Child to Mother's care after Mother corrected the issues leading to Child's removal. Even though DCS returned Child to Mother's care, there were continuing concerns about the family's living environment because there were clothes and trash covering the floor, there were kitchen knives within the

reach of Child and his siblings, there was not much food in the home, and Mother dried clothes in the oven with the oven door open. On February 10, 2016, the juvenile court adjudicated Child a CHINS and entered a dispositional order and a parental participation order. Among other things, the trial court ordered Mother to participate in individual therapy and home-based case management.

[5] In October 2016, FCM Davis visited the family's residence and, upon arriving, saw Child and his siblings playing in a fully-open upstairs window. At the time, Mother and her boyfriend were sleeping downstairs and the house was in complete disarray. Child and his siblings were dirty, and the youngest sibling was only wearing a very soiled diaper. When Mother woke up, she told FCM Davis that she had not realized the window was open. In light of her observations and the condition of the home, FCM Davis decided to again remove Child and his siblings from Mother's care. The Children's permanency plan was subsequently changed to adoption after Mother failed to successfully complete the agreed-upon court-ordered services.

[6] On July 1, 2019, DCS filed a petition to terminate Mother's parental rights to Child. On December 3, 2019, the juvenile court held an evidentiary hearing on DCS's petition. During this hearing, DCS presented evidence outlining Mother's failure to make any significant progress towards providing Child with a safe and stable living environment. Following the conclusion of the evidence, the juvenile court took the matter under advisement. On December 23, 2019,

the juvenile court entered its order terminating Mother's parental rights to Child.

# Discussion and Decision

[7]     The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Parental rights, therefore, are not absolute and must be subordinated to the best interests of the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent–child relationship. *Id.*

[8]     In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the

evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.*

[9] In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

# I. Mother's Challenge to Juvenile Court's Findings

## A. Findings 26, 38, 39, 43, and 44

[10] Mother asserts that findings 26, 38, 39, 43, and 44 ("the challenged findings") should not be considered because they "unfairly characterize the Fall 2018 change in Mother's participation in services as non-compliance when in fact the reason for the change was that Mother had consented to [Child's] adoption." Appellant's Br. p. 20. The challenged findings provide:

> 26. Following a mediation in September 2018, [Mother] stopped participating in therapy in in October 2018, [Home-based Therapist Anita] Adams closed out [Mother].
> ****

38. After [Mother] signed adoption consents as to [Child] and his siblings in September 2018, she stopped participating in services.[2]

39. [Mother] has not submitted to a drug screen since September 2018.

**\*\*\*\***

43. FCM Davis made services available until [Mother] decided not to participate.

44. Throughout the duration of the CHINS case, [Mother's] participation took on a repetitive pattern of participation followed by disengagement in services, until October 2018, when she disengaged in services entirely.

Appellant's App. Vol. II pp. 15–16. Mother concedes that the juvenile court "does acknowledge elsewhere in its findings that [she] initially consented to adoption," but claims that the juvenile court's findings do not "connect the date of the consent, September 11, 2018, with her ending participation in services thereafter." Appellant's Br. p. 20. Thus, Mother claims that "[t]he inference in [the challenged findings] that Mother chose to disengage from services in place after October 2018 ignores the fact that DCS was not providing services for Mother at this time–other than possibly visitation." Appellant's Br. p. 21.

[11] Reading the juvenile court's findings together as a whole, we cannot agree with Mother that the juvenile court failed to connect the date that Mother consented to the children's adoptions with the end of DCS offering and Mother participating in services. The juvenile court's findings are clear that DCS

---

[2] Mother revoked her adoption consent as it related to Child after a prior pre-adoptive placement "fell through." Appellant's App. Vol. II p. 15.

stopped offering, and Mother stopped participating in, services only after Mother consented to the children's adoption. As such, we cannot agree that the juvenile court's findings unfairly characterize the change in Mother's participation as non-compliance or ignores the fact that DCS stopped offering most services to Mother.

## B. Finding 24

[12] Mother also asserts that Finding 24 "is not fairly supported by the evidence." Appellant's Br. p. 22. Finding 24 provides: "[Mother] made minimal progress with Ms. Adams. She was able to obtain stable housing for a couple of months. However, she was unable to maintain stable housing for an extended period of time." Appellant's App. Vol. II p. 15. In challenging this finding, Mother claims that the evidence establishes that she once obtained stable housing for a six-month period and that the words "minimal progress" "implies fault or lack of effort." Appellant's Br. p. 22. The evidence established that throughout the CHINS and termination proceedings, Mother never maintained stable housing for more than a six-month period. The trial court did not err in finding that Mother had failed to maintain stabling housing for an extended period of time. In addition, the juvenile court's finding that, with regard to securing and maintaining stable housing, Mother made "minimal progress" is supported by the record and we cannot agree that the juvenile court's use of the words "minimal progress" implies any unfair fault of or lack of effort by Mother.

# II. Sufficiency of the Evidence

[13]    Mother contends that the evidence is insufficient to sustain the termination of her parental rights to Child. In order to support the termination of Mother's parental rights to Child, DCS was required to prove, *inter alia*, the following:

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child.

Ind. Code § 31-35-2-4(b)(2). Mother claims that DCS failed to present sufficient evidence to establish the statutory requirements by clear and convincing evidence.

## A. Indiana Code Section 31-35-2-4(b)(2)(B)

[14]    It is well-settled that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need only find that one of the conditions listed therein has been met. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where the juvenile court determines that one of the above-mentioned factors has been proven and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for

DCS to prove, or for the juvenile court to find, either of the other factors listed in Indiana Code section 31-34-2-4(b)(2)(B). *See In re S.P.H.*, 806 N.E.2d at 882. In this case, DCS had to prove either that (1) the conditions resulting in removal from or continued placement outside Mother's home will not be remedied or (2) the continuation of the parent–child relationship poses a threat to Child.

[15] The juvenile court determined that the evidence established a reasonable probability that the conditions that resulted in Child's removal from and continued placement outside Mother's care would not be remedied. When making a determination as to whether the conditions leading to placement outside a parent's care are likely to be remedied, juvenile courts "should judge a parent's fitness at the time of the termination hearing, considering any change in conditions since the removal." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007). "The trial court can also consider the parent's response to the services offered through the DCS." *Id.* "'A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change.'" *Id.* (quoting *In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*).

[16] In addition to the findings discussed above, the juvenile court made numerous other findings in support of its determination that the evidence established a reasonable probability that the conditions that resulted in Child's removal from

and continued placement outside Mother's care would not be remedied. These additional findings include:

> 15. Ashley Minor of Family and Community Partners was assigned to provide home based case management to [Mother] beginning in July 2017.
> 16. Ms. Minor established goals for [Mother] of obtaining housing; obtaining employment; improving her parenting skills; and budgeting.
> 17. While working with Ms. Minor, [Mother] resided in three (3) different homes.
> 18. [Mother] was employed at Subway for approximately three (3) months while working with Ms. Minor.
> 19. [Mother's] budgeting was usually off in that she had insufficient funds to cover her expenses.
> 20. In April 2018, Ms. Minor unsuccessfully discharged [Mother] due to non-compliance.
> 21. [Mother] is currently undocumented and is unable to receive a Social Security Card.
> 22. Anita Adams of Family and Community Partners was assigned to provide individual therapy for [Mother] in June 2017.
> 23. Ms. Adams established goals for [Mother] of becoming stable and self-sufficient.
> ****
> 25. [Mother's] biggest obstacles to stability were insufficient financial resources and her undocumented status.
> ****
> 35. [Mother] does not currently have her own home. She is residing with a friend.
> 36. [Mother] has not had any parenting time with the child since July 2019.
> 37. [Mother] claims that she has been working on her immigration status for the past four (4) years. However, her status remains undocumented.
> ****

41.    After the child was removed from [Mother's] care and custody in October 2016, he has not been returned.

42.    Since the child was removed from [Mother's] custody, her parenting time has been inconsistent. She initially had parenting time two (2) times per week. Then it was reduced to once per week. Then it was reduced to once per month.

****

45.    [Mother] has also been inconsistent in providing her contact information to FCM Davis.

Appellant's App. Vol. II pp. 15–16. Based on its findings, the juvenile court concluded

> There is a reasonable probability that the conditions that resulted in the child's removal and continued placement outside of the home will not be remedied by his mother. [Mother] has had four years to put forth an effort and has made little progress. Stability and sobriety remain major concerns. [Mother] has provided a number of excuses for her inconsistency but is in largely the same position she was in when the CHINS case began four (4) years ago.

Appellant's App. Vol. II p. 16.

In claiming that the evidence is insufficient to prove that the conditions that resulted in Child's removal from her care are unlikely to be remedied, Mother asserts that concerns for her sobriety are unjustified, the suggestion that she has put forth little effort to improve her situation is erroneous, and while she was unable to provide the necessary care for all five of her children, she has voluntarily terminated her parental rights to four of her children and DCS has

failed to establish that she would be unable to provide the necessary care for Child. We disagree with all three of Mother's assertions.

[19] Minor provided home-based case-management services to Mother. Minor testified that Mother failed to maintain stable housing and that Mother "moved around a lot," living in three different residences in less than one year. Tr. Vol. II p. 17. Mother did not meet her home-based case-management goals of obtaining and maintaining stable housing, did not maintain stable employment, and her budget "was really off a lot." Tr. Vol. II p. 19. Minor provided Mother with names and numbers of individuals who could help her resolve the issues surrounding her immigration status but did not know if Mother followed through with any of the contacts. Mother's home-based case management was ultimately closed unsuccessfully for non-compliance "because of inconsistency and then sometimes it was hard to get ahold of [Mother]." Tr. Vol. II p. 19.

[20] Adams, Mother's home-based therapist, testified that while Mother made progress in some aspects of her treatment, Mother was never able to maintain stable housing for longer than six months. Adams testified that Mother put forth the effort to try to improve her situation but was also unable to obtain stable employment. Adams indicated that Mother's immigration status contributed to her struggles. Adams further indicated that at some point, Mother spoke to an attorney about her options for resolving the issues surrounding her immigration status. Adams and Minor both acknowledged that while Mother loved Child, she was unable to complete the steps necessary for providing a safe and stable environment for Child.

[21]     FCM Davis testified that DCS "worked really hard" with Mother.  Tr. Vol. II p. 68.  DCS offered Mother various services, making referrals for home-based case management, home-based therapy, parent aid, drug screens, and visitation.  FCM Davis opined that reunification was not a possibility at the time of the evidentiary hearing because Mother had displayed a pattern of inconsistency throughout the underlying CHINS case and had not successfully completed any services.  Specifically, FCM Davis explained that reunification was not possible because while she had not had much recent contact with Mother,

> we have been at this for four years … it just seems like she is still in the same position that she was in the last time that we spoke. We left the referral open for her to visit with her kids and her last visit was in July, so even just getting her to be consistent with visits hasn't been successful.  So I don't see reunification happening in the near future for her.

Tr. Vol. II p. 71–72.

[22]     In addition, Child's guardian ad litem ("GAL") Joyce Box testified that Mother had ongoing issues with stability and had failed to successfully complete services.  She explained that

> At the time that the plan had changed, there was still positive screen for Marijuana, which had been an issue on and off throughout the case.  Mother would start to engage in services and then she would become inconsistent and same thing with parenting time and visitation.  She would interact well with [Child] for a period of time and then she would be inconsistent and it would impact [Child] in a negative way.  We had worked with mom for such a long period of time.

Tr. Vol. II p. 88. GAL Box indicated that Mother would need to address these ongoing issues before GAL Box could recommend placement of Child back into Mother's care, explaining that

> Mother would need to secure and be able to maintain stable employment and housing for a period of time because that has been an issue on and off throughout the case, being able to maintain employment and housing in addition to sobriety; maintaining sobriety, and engaging in services, mental health treatment, by engaging in home-based therapy and then we would need to see positive recommendations from those service providers.

Tr. Vol. II p. 88.

[23] The record indicates that Mother has demonstrated a pattern of making short-term progress with services only to later regress and has failed to make long-term progress toward remedying the conditions that led to Child's removal. As such, we conclude that the evidence is sufficient to support the conclusion that there is a reasonable probability that the conditions that resulted in Child's removal from Mother's care would not be remedied. Mother's claim to the contrary amounts to nothing more than an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

## B. Indiana Code Section 31-35-2-4(b)(2)(C)

[24] We are mindful that in considering whether termination of parental rights is in the best interests of the children, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v.*

*Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the interests of the parents to those of the children involved. *Id.* "A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the best interests of the children." *Lang*, 861 N.E.2d at 373. Furthermore, this court has previously determined that the testimony of the case worker, GAL, or a CASA regarding the children's bests interests supports a finding that termination is in the children's best interests. *Id.* at 374; *see also Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

[25]     The juvenile court concluded that termination of Mother's parental rights was in Child's best interests, stating as follows:

> Termination of the parent-child relationship is in [Child's] best interests. Termination would allow him to be adopted into a stable and permanent home where his needs will be safely met. The child has received therapy since his removal from his Mother's custody and has become much more outgoing and his school performance has improved. The child is placed with his biological sisters which is where he desires to be…. The Guardian ad Litem agrees with the permanency plan of adoption as being in the child's best interests.

Appellant's App. Vol. II p. 16. The juvenile court's conclusion is supported by the testimony of FCM Charla Davis, GAL Box, and Child's home-based case manager.

During the evidentiary hearing, Lonnie Jones, Child's home-based case manager, testified to the vast improvements Child had made since being placed in a stable living environment. Specifically, Jones testified that when he first met Child, Child did not really interact with him, was "very quiet," and did not really have many interests. Tr. Vol. II p. 33. Jones testified that Child has made significant progress, describing Child as "[t]he opposite" because he talks and "likes all kinds of stuff." Tr. Vol. II p. 33. Child will play games, order his own food, and speak to people in public. Jones indicated that Child "has grown a lot" socially. Tr. Vol. II p. 33. Child is more confident and outgoing. Jones further testified that Child "really wanted to be with his" sisters and "has been happy" in his current pre-adoptive placement. Tr. Vol. II pp. 34, 35.

In addition, both FCM Davis and GAL Box testified that termination of Mother's parental rights was in Child's best interests. FCM Davis testified that termination of Mother's parental rights was in Child's best interests, explaining that adoption would be "the next best permanency plan" for Child because reunification failed, establishing a guardianship "wasn't an option," and Child "is not old enough" for APPLA.[3] Tr. Vol. II p. 73. GAL Box testified that termination of Mother's parental rights was in Child's best interests, explaining that

---

[3] "APPLA" stands for "another planned permanent living arrangement," which replaced the term "long-term foster care." https://www.childwelfare.gov/topics/outofhome/foster-care/oppla-appla/ (last visited July 7, 2020). APPLA is a "permanency option only when other options such as reunification, relative placement, adoption, or legal guardianship have been ruled out." *Id.*

> [Child] deserves permanency; this case has been open for a really long time. It has been four years. We have worked with mother for four years now and we have been unable to return [Child] to her care. [Child] deserves permanency where he can, you know, be long term and he is doing very very well in his placement. He has been wanting to go with his siblings for quite some time and so he is with them now and he is doing well.

Tr. Vol. II p. 89. Mother does not challenge either FCM Davis's or GAL Box's testimony. Instead, she challenges the juvenile court's conclusion that termination of her parental rights was in Child's best interests, arguing that the juvenile court's conclusion "runs counter to clear guidance repeatedly given by this Court and our Supreme Court." Appellant's Br. pp. 39–40. We disagree.

[28] Considering FCM Davis's and GAL Box's testimony regarding Child's best interests together with the evidence regarding Mother's failure to successfully complete services or remedy the reasons for Child's removal from her care and Jones's testimony regarding Child's developmental progress, we conclude that the juvenile court's determination that termination of Mother's parental rights is in Child's best interests is supported by sufficient evidence. Mother's claim to the contrary again amounts to nothing more than an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

[29] The judgment of the juvenile court is affirmed.

Najam, J., and Mathias, J., concur.